United States District Court
For the Northern District of California

1

2

3

4                       UNITED STATES DISTRICT COURT

5                     NORTHERN DISTRICT OF CALIFORNIA

6

7    BRENDA J. NASSER,

8              Plaintiff,                          No. C 05-5426 PJH

9         v.                                       **ORDER GRANTING MOTION
                                                   FOR SUMMARY JUDGMENT**
10   AT & T CORP., and DOES 1 through 50,

11

12             Defendants.
                                           /
13

14        Defendant's motion for summary judgment came on for hearing before this court on

15   February 28, 2007.  Defendant, AT&T Corp. ("AT&T"), appeared through its counsel,

16   Katherine Huibonhoa.  Plaintiff appeared through her counsel Michelle Ferber.  Having

17   read the parties' papers and considered their arguments and the relevant legal authority,

18   and good cause appearing, the court hereby GRANTS defendant's motion for summary

19   judgment for the reasons that follow.

20                              **BACKGROUND**

21        The following facts are not in dispute.  Plaintiff Brenda Nasser ("Nasser") began

22   employment with the Bell Operating Company in 1970.  Nasser Dep. 15:6-14.[1]  She joined

23   AT&T in 1984, and has worked continuously with AT&T since then.  *Id.* at 18:22-24.  She

24   worked with the company in various locations, departments, and positions before joining

25   AT&T's Global Real Estate organization ("GRE") in 1994.  *See generally id.* at 18:7-21:12.

26   During Nasser's employment with AT&T, she has received numerous promotions, pay

27   increases, bonus and commission payments, and stock option awards.  *Id.* at 285:24-

28
     _____

          [1] Citations to "Dep." are to the deposition transcripts submitted by both parties.

**United States District Court**

For the Northern District of California

1    286:23.

2        Nasser joined GRE in 1994 as a portfolio manager, a third-level manager position,

3   and has remained in that job.  *Id.* at 21:13-21, 23:23-24:2, 24:12-14.  As a portfolio

4   manager, Nasser is responsible for planning and building out AT&T real estate space in her

5   assigned geographical regions.  Nasser was one of eight or nine third-level managers at

6   GRE as of January 2005.  *Id.* at 168:13-18.  At AT&T first level managers are also referred

7   to as A-band; second-level as B-band; third-level as C-band, or district-level;  fourth-level

8   as D-band, or division-level; and fifth-level as E-band, or Vice-President.  *Id.* at 24:12-25:6,

9   25:10-16.

10       During Nasser's tenure, AT&T experienced significant corporate restructuring and

11  severe downsizing.  As a result GRE has experienced severe downsizing as well, going

12  from approximately 2,200 employees in 1996 to fewer than 400 employees by the end of

13  2005.  Brazzell Dep. 25:16-27:16.  Consistent with this restructuring, the reporting structure

14  in GRE has changed a number of times.

15       When Nasser joined GRE in 1994, there were two fourth-level managers on the

16  business side, Alan Abrahamson and John Klamut.  Nasser Dep. 46:11-15.  There remain

17  two such managers today.  *See id.* at 68:15-69:2.  Klamut at all times has been responsible

18  for engineering, construction, and design.  *Id.* at 54:19-55:11.  Abrahamson generally has

19  been responsible for property management and asset management.  *Id. at* 54:1-18.

20       Defendant asserts that since 1994, there have only been two fourth-level GRE

21  manager position openings, one in 1996 and another in 1998.   Brazzell Dep. 29:15-21;

22  Abrahamson Dep. 115:14-19, 134:1-5; Leibold Dep. 81:11-82:3, 84:4-7.  In approximately

23  1996, as part of a restructure, the GRE created a new fourth-level manager position.

24  Nasser Dep. 44:23-45:5, 88:19-21; 47:7-18; Brazzell Dep. 30:24-31:22.  Tom Savistano

25  was selected to fill the new position.  *Id.*  In 1998, Savistano accepted a companywide

26  voluntary retirement package and GRE filled the position Savistano vacated.  Scott Leibold,

27  who had been a third-level manager reporting to Savistano, was selected for the position.

28

**United States District Court**
For the Northern District of California

1   Nasser Dep. 57:21-24; Leibold Dep. 62:22-63:4.  In addition, there was a fourth-level GRE

2   manager responsible for human resources, Carol Cunningham.  Nasser Dep. 55:14-22,

3   56:11-15, 60:4-7.  When Cunningham left the company in or about 1996, her fourth-level

4   GRE position was not filled.  *Id.*

5        AT&T policy provides that internal job openings which offer promotional

6   opportunities are to be posted on an intranet.  Nasser Dep. 32:1-33:7, 96:5-14, 144:24-

7   145:1, 145: 3-17, 145:24-25, 319:10-18.  In order to be considered for a posted position, an

8   employee must apply by submitting a resume and other paperwork.  *Id.* at 317:3-24,

9   318:23-319:1, 319:10-18; *see also* Leibold Dep. 89:15-90:15, 91:5-8; Abrahamson Dep.

10  46:25-48:1; Lewis Dep. 90:12-91:9.

11       Nasser admits that from 1994 to 2006, she did not regularly monitor the intranet for

12  open positions.  Nasser Dep. 96:15-25.  She also admits that she never applied for any

13  promotion.  *id. at* 95:4-24. [2]  Defendant does admit that from time to time, a candidate may

14  be designated as "pre-identified" or "preferred" for an opening.  Where there is such a

15  candidate, however, the position remains open and all applicants, including the "pre-

16  identified" or "preferred" candidate, are considered.  Brazzell Dep. 83:15-84:9; Leibold Dep.

17  58:13-23; Abrahamson Dep. 45:16-46:11, 119:17-120:10.

18       On January 27, 2005, Nasser attended a GRE meeting with second-level and above

19  managers at AT&T's Bridgewater, New Jersey facility.  Nasser Dep. 161:1-12.  There were

20  approximately 85 to 100 attendees at the meeting.  The attendees were mostly GRE

21  managers (including international employees), as well as some managers from other

22  departments.  *Id.* at 162:1-21.

23       GRE had previously held similar meetings, the purpose of which was to gather

24  managers together to talk about key issues and developments.  *Id.* at 162:22-163:19; *see*

25  *also* Abrahamson Dep. 49:9-17.

26

27       [2] While the policy of posting positions is subject to a handful of exceptions, (*e.g.*, college
28  hire program, technical positions), none of them appear to apply here.

**United States District Court**

For the Northern District of California

1    Tom Schaible, a third-level manager and one of Nasser's peers, was asked by the

2  meeting planners to perform a skit in order to provide some levity to what would otherwise

3  be a serious business meeting.  Nasser Dep. 161:13-23, 164:16-20, 165:9-11.  Schaible

4  had performed skits on at least two other prior occasions, which the GRE group (including

5  Nasser) had found humorous.  Nasser Dep. 165:18-166:3; Schaible Dep. 20:10-12;

6  Brazzell Dep. 48:7-25, 49:1-4; Abrahamson Dep. 51:12-23.  None of Schaible's prior skits

7  had been considered inappropriate, and GRE management had no prior knowledge of the

8  content of his skit planned for the January 27 meeting.  Schaible Dep. 24:2-14; Leibold

9  Dep. 23:2-11; Abrahamson Dep. 53:14-18, 55:9-16, 56:14-18.

10    Schaible performed his skit on January 27 shortly before lunch.  Nasser Dep.

11  163:20-22, 164:13-15.  Schaible's skit centered around the theme of employee longevity

12  and described how each of the nine third-level managers (including himself and Nasser)

13  had survived downsizing and/or would survive the imminent merger with SBC.  *Id.* at

14  166:10-167:2; Schaible Dep. 23:5-21, 24:19-25:1; Abrahamson Dep. 53:24-54:13.  In his

15  skit Schaible played a character called "Tommy Tool Belt" or "Tommy Tooltime" and used

16  props from his garage.  Leibold Dep. 23:12-21; Abrahamson Dep. 51:24-52:20.

17    The skit was comprised of nine segments, one for each of the third-level GRE

18  managers.  Schaible Dep. 24:19-25:1; Abrahamson Dep. 55:4-8; *see also* Nasser Dep.

19  167:10-22, 168:2-4, 168:13-18, 168:24-169:1, 187:1-3, 187:11-15, 187:21-24, 188:3-7,

20  188:10-13, 188:17-20, 188:24-189:3; 189:6-11.  The skit was designated on the schedule

21  to be about 30 minutes long, but apparently lasted somewhere between 15-20 minutes,

22  with each segment lasting "a couple of minutes."  *Id.* at 167:3-6, 169:5-12.  During the

23  segment on Nasser, Schaible identified "flexibility" as her key to success and joked that she

24  had trouble with flexibility after she injured her back in a car accident.  *Id.* at 169:13-170:23,

25  171:7-10, 171:25-172:9.  Schaible used as a prop a makeshift back brace he constructed

26  with miscellaneous items from his garage, including two quart-size coffee cans, which he

27  attached to the front of the brace to represent Nasser's breasts.  *Id.* at 171:20-22, 209:2-9;

28

4

**United States District Court**
For the Northern District of California

1  Schaible Dep. 50:12-15; Abrahamson Dep. 70:24-71:5.  According to Nasser, Schaible

2  then "pranced" around on the stage so the coffee cans "bounced up and down with great

3  force."  Nasser Dep. 171:20-22.

4         After the lunch break that followed the skit, Schaible apologized to the entire group

5  for any offensive conduct and reiterated his own personal commitment to diversity in the

6  workplace.  Complaint ¶ 11; Nasser Dep. 194:5-195:1; *see also* Schaible Dep. 62:3-63:9;

7  Brazzell Dep. 60:2-18; Leibold Dep. 34:22-35:17; Abrahamson Dep. 86:5-17.  Although

8  Nasser was terribly upset by the incident, she admits that she held her emotions in check

9  so that her feelings were not evident to others, either during or after the skit.  Nasser Dep.

10  205:15-206:3.

11        While Nasser made no formal complaint about the skit at the time, she did comment

12  to Leibold: "Just when I think you folks are going to do the right thing, you do something

13  that really makes me want to sue you."  *Id.* at 195:25-196:13.  However, because Nasser

14  assumed that Schaible would be fired over the incident and she felt badly about that, she

15  told also Leibold that she hoped Leibold "wasn't going to do anything drastic" to Schaible,

16  and that if there were any repercussions from the skit, she would speak on Schaible's

17  behalf.  *Id.* at 204:16-205:7, 207:6-17; Leibold Dep. 39:5-13.

18        Later that afternoon, Schaible approached Nasser, who was with another third-level

19  female manager, Judy Kolet, and thanked them for being good sports.  Nasser told

20  Schaible that the skit was an "error in judgment."  Nasser Dep. 200:5-11.  On January 27,

21  after the conference ended, Leibold, who had been present during the skit, met with

22  Schaible and counseled that the skit was inappropriate and that he (Schaible) had done the

23  right thing by apologizing promptly.  *Id.* at 202:24-203:2; Schaible Dep. 65:9-66:1; Leibold

24  Dep. 122:11-123:10.

25        No managers called Nasser after the incident to check in with her about it.  About a

26  week to ten days later, Nasser spoke with Abrahamson about the skit.  Nasser Dep.

27  196:18-25, 212:1-14.  She and Abrahamson thereafter had a few follow-up conversations

28

United States District Court
For the Northern District of California

1  regarding the skit, during which Nasser expressed that she was upset about it and wanted

2  to know what GRE leadership was going to do.  *Id. at* 196:18-25, 210:2-211:4, 212:1-14.

3  Abrahamson listened carefully to her complaint and agreed that the skit was inappropriate.

4  *Id.* at 260:21-261:19; Abrahamson Dep. 15:16-22.  Nasser did not  complain about the skit

5  to anyone in human resources.  Nasser Dep. 259:2-6.

6          GRE leadership discussed how best to respond further to the situation.  They

7  decided to initiate additional diversity training sessions, which were held in 2005, and also

8  issued a letter that, among other things, reaffirmed the company's commitment to diversity

9  values.  *Id.* at 218:16-219:2, 219:10-25, 258:12-24, 264:16-24 & Exh. 8; *see also* Leibold

10  Dep. 42:9-43:8, 44:1-4; Brazzell Dep. 55:6-56:5; Abrahamson Dep. 19:5-21:7,31:10-20.

11          Nasser and Schaible's relationship both prior to and after the skit has been

12  professional.  Nasser Dep. 174:21-175:1, 180:2-7.  Because Schaible works in New Jersey

13  while Nasser works in California, they do not work together on a day-to-day basis and

14  interact only on "rare occasions."  *Id.* at 180:11-16, 180:20-181:2.  Nasser has never heard

15  Schaible say anything or act in any way that she found to be derogatory towards women,

16  either before or after skit.  *Id.* 175:2-9,180:8-181:9.  Nor have there been any other

17  complaints of sexual harassment by Schaible, either before or after the skit.  *Id.* 175:10-16,

18  180:8-181:9; *see also* Schaible Dep. 70:23-71:2; Leibold Dep. 47:20-23.

19                                                **DISCUSSION**

20  **A.      Motion for Summary Judgment**

21          **I.      Legal Standard**

22          Summary judgment shall be granted if "the pleadings, depositions, answers to

23  interrogatories, and admissions on file, together with the affidavits, if any, show that there is

24  no genuine issue as to any material fact and that the moving party is entitled to judgment

25  as a matter of law."  FRCP 56(c).  Material facts are those which may affect the outcome of

26  the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to

27  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

28

**United States District Court**

For the Northern District of California

1  verdict for the nonmoving party. Id. The court must view the facts in the light most

2  favorable to the non-moving party and give it the benefit of all reasonable inferences to be

3  drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

4  587 (1986).

5        **II.     Analysis**

6        Nasser asserts three claims under California's Fair Employment and Housing Act,

7  Government Code § 12940, et seq. ("FEHA"), including claims for 1) gender/sex

8  discrimination, 2) sexual harassment, and 3) failure to prevent discrimination or

9  harassment. Defendant moves for summary judgment on all three claims.

10        **a.     Discrimination**

11        Nasser's discrimination claim is based on defendant's failure to promote her to a

12  fourth-level, or higher, manager position which plaintiff contends was the result of

13  discrimination based on her gender. However, the exact position into which she believed

14  she should have been promoted is not entirely clear. Her complaint alleges that within the

15  last nine years, approximately five promotional opportunities above her level became

16  available, that she was the most qualified person for each of them, and that they all went to

17  males. It does not, however, identify the positions. *See* Complaint ¶¶ 6-8. According to

18  defendant, during her deposition, Nasser identified a fourth-level position that Ken Wells

19  received in 1996 or 1997; a newly created fourth-level position received by Tom Savistano

20  in 1996 and vacated by him in 1998, which remained unfilled; a fourth-level position

21  vacated by Scott Leibold in 2001 or 2002, which also remained unfilled for a while; and a

22  fifth-level position Leibold received in 2004, for which she would have been qualified if she

23  had received his fourth-level position two years earlier. She also took the position that

24  defendant should have upgraded her position or created a new position for her.

25        At the hearing, when asked to identify the promotional opportunities at issue, she

26  identified the fourth-level position going to Wells, the fourth-level position going to

27  Savistano, and the fourth-level position which remained unfilled after it was vacated by

28

United States District Court

For the Northern District of California

1   Leibold.  She also asserted that a pattern of discrimination is shown by defendant's leaving

2   promotional positions unfilled until a male candidate could be groomed, by defendant's

3   requiring her to supervise a peer–another third-level manager.  Thus, the court will

4   determine whether defendant discriminated against plaintiff by: 1) failing to promote her into

5   either the 1996 or 1998 open fourth-level positions, 2) leaving promotional positions unfilled

6   until a male candidate could be groomed for the position, 3) requiring that plaintiff supervise

7   a peer, or 4) failing to create a higher-level position for her in the absence of an open

8   higher-level position.

9          Defendant seeks summary judgment on the discrimination claim on two grounds.

10  First it argues that plaintiff's sex discrimination claim is time-barred.  Second, defendant

11  argues that even if the claim were not time-barred, plaintiff cannot establish a *prima facie*

12  case of sex discrimination.

13                    **i.      Plaintiff's Failure to Promote Claim is Time-barred**

14         An employee seeking relief under FEHA must exhaust her administrative remedies

15  by filing a verified complaint with the California Department of Fair Employment and

16  Housing ("DFEH") within one year of the alleged adverse action.  *See* Cal. Gov't Code

17  § 12960(d) ("No [administrative] complaint may be filed after the expiration of one year from

18  the date upon which the alleged unlawful practice or refusal to cooperate occurred"); *see*

19  *also Accardi v. Superior Court*, 17 Cal. App. 4th 341, 349 (1993) ("A person who brings a

20  cause of action for . . . discrimination, under the provisions of FEHA, must first file a claim

21  with the DFEH. . . . within one year of the date upon which the alleged act of discrimination

22  occurred."), *disapproved on other grounds in Richards v. CH2M Hill, Inc.,* 26 Cal. 4th 798,

23  802, 816 (2001); *Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 492 (1996) ("The timely

24  filing of an administrative complaint is a prerequisite to the bringing of a civil action for

25  damages under the FEHA."); *Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1040

26  (2002) (affirming summary judgment for employer; alleged discriminatory acts that occurred

27  prior to one year before the filing of plaintiff's administrative complaint with the FEHA

28

1   "cannot serve as the basis for liability").

2        Here, Nasser filed her charge of discrimination with the DFEH on August 29, 2005.

3   Nasser Dep. 274:11-22 & Exh. 9.  Therefore, any purported discriminatory conduct

4   occurring before August 29, 2004 is time-barred.  It is undisputed that the most recent

5   opening for a fourth-level position occurred in 1998, seven years before Nasser filed her

6   DFEH charge.  Thus, this claim, to the extent that it is based on her failure to obtain an

7   actual promotion to an open position, is time-barred.

8        Relying on a continuing violation theory, plaintiff asserts that her claim is not time-

9   barred because discriminatory conduct against her with regard to promotions is ongoing.

10  The continuing violation theory requires that at least one alleged violation occur within the

11  limitations period, here, between August 29, 2004 and August 29, 2005.   It also requires

12  that: (1) the actions be sufficiently similar in kind; (2) they occur with sufficient frequency;

13  and (3) they have not acquired a degree of "permanence" so that employees are on notice

14  that further efforts at informal conciliation with the employer to obtain accommodation or

15  end harassment would be futile.  *See Richards v. CH2M Hill, Inc.,* 26 Cal. 4th at 802.

16       As previously noted, plaintiff's continuing violation theory is premised on defendant's

17  "pattern" of discrimination as shown by its leaving higher-level positions unfilled until males

18  can be groomed, by its requirement that she supervise a peer at her own level rather than

19  being promoted to a higher level, and by its failure to create a higher-level position for her.

20  However, plaintiff cites no authority, nor is the court aware of any, that any of these three

21  things are actionable as discrimination.

22       More significantly, however, plaintiff cannot establish a continuing violation under the

23  test set forth in *Richards*, a case plaintiff cites.  None of the three acts comprising the

24  "pattern" are tantamount to failure to hire for an open position.  The last opening occurred

25  seven years before she filed her DFEH charge, and plaintiff was only given the peer

26  supervision responsibility relatively recently.  Equally significantly, the failure to promote

27  Nasser into one of the two actual open positions, are discrete concluded acts.  *See Nat'l*

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    *R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("[d]iscrete acts such as . .

2    .*failure to promote*, denial of transfer, or refusal to hire are easy to identify"; thus, "[e]ach

3    incident of discrimination . . . constitutes a separate actionable 'unlawful employment

4    practice'" that must be timely acted upon or lost) (emphasis added); *see also Morgan v.*

5    *Regents of Univ. of Cal.*, 88 Cal. App. 4th 52, 65-67 (2000) (plaintiff's failure to re-hire claim

6    was time-barred and could not be saved by any continuing violation theory; "[E]ach time

7    appellant was informed he was not being hired for a position to which he had applied, he

8    was, or should have been, aware this action might be contrary to his preferential rehire

9    rights.")

10    The underlying rationale of the continuing violation doctrine is to provide an

11    "equitable exception to the timely filing requirement" where a plaintiff may not immediately

12    suspect unlawful conduct because the conduct at issue has not yet matured into a

13    recognizable claim.  *Morgan*, 88 Cal. App. 4th at 63-64 ("[T]he continuing violation doctrine

14    is premised on the equitable notion that the statute of limitations should not begin to run

15    until a reasonable person would be aware that his or her rights have been violated.")

16    (citation omitted); *Yankowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1059 (2005) ("[T]he

17    FEHA statute of limitations begins to run when an alleged adverse employment action

18    acquires some degree or permanence").  Nasser admits that she believed she had been

19    discriminated against at the time the promotions at issue were denied and there have been

20    no promotional opportunities since then.  *See* Brazzell Dep. 29:15-21; Abrahamson Dep.

21    115:14-19, 134:1-5; Nasser Dep. 91:1-8, 93:1-4, 120:22-121:7.

22    Nasser also claims that the Schaible skit was discriminatory and a part of the

23    "pattern" of discrimination defendant engaged in against her.  Nasser Dep. 72:15-21.

24    However, this conduct by a co-worker does not constitute a cognizable adverse

25    employment action committed by her employer and will, therefore, be analyzed solely as a

26    basis for Nasser's harassment claim.

27    As there were no denials of promotion during the limitations period, and because the

28

court finds that the requirement of peer supervision, the only act occurring within the

limitations period, was not equivalent to the denial of a promotion, the continuing violation

doctrine simply does not apply.  Accordingly the claim of sex discrimination is time-barred.

### ii.     Plaintiff Cannot Establish a Prima Facie Case of Discrimination

The framework for proving employment discrimination is well established.  Because

of the similarity between state and federal employment discrimination laws, California

courts look to pertinent federal precedent when applying California states.  *Guz v. Bechtel*

*Nat'l, Inc.*, 24 Cal. 4th 317, 354 (2000).  First, an employee bears the initial burden of

proving a prima facie case of unlawful discrimination.  To establish a prima facie case, the

employee must show (1) that he/she belongs to a protected class, (2) was performing

according to his/her employer's legitimate expectations, (3) suffered an adverse

employment action, and (4) that other employees with qualifications similar to his/her own

were treated more favorably.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

(1973); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  This is only a

minimal evidentiary burden, and a plaintiff need only give rise to an inference of unlawful

discrimination.  *See Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1229 (9th Cir.1995).

Second, if the employee produces sufficient evidence to establish a prima facie

case, the burden shifts to the employer-defendant to articulate a "legitimate

nondiscriminatory reason" for the adverse employment action.  *See Texas Dept. of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  Finally, if the employer is able to articulate

a legitimate, nondiscriminatory reason for its action, this dispels the inference of

discrimination raised by plaintiff's prima facie case, leaving the employee with the ultimate

burden of persuading the trier of fact that defendant intentionally discriminated against the

employee.  A plaintiff employee may satisfy this burden by proving that the legitimate

reasons offered by defendant were factually untrue, thereby creating an inference that

those reasons were merely a pretext for discrimination.  *See Reeves v. Sanderson*

**United States District Court**

For the Northern District of California

*Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

In the job promotion context, plaintiff must show that: (1) she belongs to a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) she was rejected despite her qualifications; and (4) that defendant filled the position with a man or continued to consider other applicants whose qualifications were comparable to hers after rejecting her.  *See Perez v. County of Santa Clara*, 111 Cal.App.4th 671, 675-76 (2003).

Defendant argues that even if plaintiff's claim was not time-barred, plaintiff cannot meet her burden of establishing a prima facie case of discrimination as she cannot show that  she applied for any available position and, therefore, cannot show that she was rejected despite her qualifications.  Nasser admits that she has never applied for a promotion while she has been in GRE.  Although she states that she did not apply for the positions because she was unaware of them, she also admits that she did not check the intranet postings for listings of open positions.  Thus, defendant is correct, plaintiff cannot establish a prima facie case of discrimination.  *See Levy v. Regents of the Univ. of Cal.*, 199 Cal. App. 3d 1334, 1346-47 (1988) ("In establishing a prima facie case of employment discrimination, it is incumbent upon appellant to establish that he did everything that was required of him as an applicant and met all the qualifications of the position in question, but still was not hired.").

Moreover, even assuming a prima facie case, the question of pretext is problematic for plaintiff.  To survive summary judgment, Nasser must point to "*specific* and *substantial* evidence" demonstrating that she was not promoted to a fourth-level position *because of* her sex.  *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 661 (9th Cir. 2002) (affirming summary judgment in favor of employer on race discrimination claim)(emphasis in original); *Perez*, 111 Cal. App. 4th 671, 676-77 (a FEHA plaintiff at all times retains the burden of showing "that she has been the victim of intentional discrimination").

**United States District Court**

For the Northern District of California

1    Nasser has presented no direct evidence of discrimination, such as discriminatory

2  remarks. (Nasser Dep. 129:7-15, 130:10-18.)   Plaintiff is left therefore only with her own

3  belief that if defendant was serious about diversity it would have taken the opportunity to

4  promote a woman when an opening occurred.  Such, however, does not constitute

5  evidence of discrimination.  *See, e.g., Phipps v. Gary Drilling Co.* 722 F. Supp. 615, 620

6  (E.D. Cal. 1989) ("The [anti-discrimination law] was not intended as a vehicle for the

7  general judicial review of business decisions.  Nor does the court sit as a 'super personnel

8  department that re-examines entities' business decisions.").  The mere fact that a man was

9  placed in the two open positions, without more, does not demonstrate that the decisions

10  were the product of animus against women.  *See Los Angeles County Dept. of Parks &*

11  *Recreation v. Civil Service Comm'n*, 8 Cal. App. 4th 273, 282, 284 ("[T]o establish

12  intentional discrimination a minority plaintiff must show more than that a non-minority

13  competitor was preferred. * * * The absence of affirmative favoritism toward a minority

14  candidate is not by itself evidence of intentional discrimination against the minority

15  candidate.").

16    Nor has plaintiff produced evidence that her qualifications were "clearly superior" to

17  the qualifications of the selected candidate in order to demonstrate pretext.  *See Read v.*

18  *Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003) (plaintiff's

19  qualifications must be "clearly superior" to raise a triable question of discrimination).  An

20  employee's subjective personal judgments of his or her competence alone do not raise a

21  genuine issue of material fact.

22         **b.    Sexual Harassment**

23

24    Nasser's sexual harassment claim is based solely on the January 27, 2005 skit

25  performed by Schaible.  Nasser Dep. 160:11-25.  To state a prima facie case for "hostile

26  environment" sexual harassment under FEHA, plaintiff must prove that she: (1) was

27  subjected to unwelcome sexual advances, conduct or comments; (2) the harassment

28  complained of was based on sex; and (3) the harassment was "so severe or pervasive" as

**United States District Court**

For the Northern District of California

1  to "alter the conditions of the victim's employment and create an abusive working

2  environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986); *Fisher v. San Pedro*

3  *Peninsula Hosp.*, 214 Cal. App. 3d 590, 609 (1989) (adopting federal case law for hostile

4  environment sexual harassment claims under California law).  Additionally, in order to

5  render the employer liable for hostile environment harassment, plaintiff must prove that the

6  employer knew or should have known of the harassment and failed to take prompt remedial

7  action.  *See* Cal. Gov't Code § 12940(j)(1).

8      Plaintiff cites to *Quantock v. Shared Mktg. Servs.*, 312 F.3d 899 (7th Cir. 2002), as

9  support for the proposition that where harassment is based on a single incident, the court

10  must look at the "totality of the circumstances to determine whether a reasonable person in

11  plaintiff's position would find that the incident" unreasonably interferes with an employee's

12  work performance.   While *Quantock* does recite the standard that, "In determining whether

13  conduct is "severe or pervasive" enough to alter the conditions of employment, we look at

14  the totality of the circumstances, including ... the frequency of the discriminatory conduct,

15  its severity, whether it is physically threatening or humiliating or a mere offensive utterance;

16  and whether it unreasonably interferes with an employee's work performance," the facts of

17  *Quantock* undercut plaintiff's position.  In *Quantock*, plaintiff's supervisor made repeated,

18  although infrequent, direct requests for sex from plaintiff.  The court found that because the

19  requests came from plaintiff's direct supervisor with whom she worked in close quarters,

20  these occasional remarks could still be actionable.

21      In contrast "occasional vulgar banter, tinged with sexual innuendo"  has been

22  deemed to fall short of the hostile workplace standard.  Defendant argues that the single

23  skit at issue here was "boorish at most, not nearly severe enough to constitute a legally

24  hostile work environment."  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271

25  (2001)("no reasonable person could have believed" that a "single incident" of crude

26  comment and innuendo could constitute actionable harassment)(per curiam); *Manatt v.*

27  *Bank of Am.*, 339 F.3d 792, 798-99 & n.6 (9th Cir. 2003) (affirming summary judgment in

28

14

favor of employer; environment where employee was subjected "often" to "numerous" "racially offensive jokes" and epithets, and to two more severe incidents, over the course of more than two years was not objectively abusive, as required; the alleged conduct "f[e]ll into the 'simple teasing' and 'offhand comments' category of non-actionable" harassment). *Accord Roby v. McKesson*, 146 Cal. App. 4th 63, 76 (2006)("The FEHA is not intended to protect employees from rude, boorish, or obnoxious behavior . . . .In order to constitute actionable harassment, the evidence must show that 'the workplace is permeated with "discriminatory intimidation, ridicule, and insult" . . . .'").

Plaintiff argues that because there were 85-100 persons in attendance at the meeting at which the skit was performed, the court should view this single incident as 85-100 separate incidents.  Plaintiff has provided, however, no authority for the court to do this.  Defendant cites to two cases in support of its position that summary judgment is warranted.  In *Pickens v. Shell Tech. Ventures Inc.*, 118 Fed. Appx. 842, 850 (5th Cir. 2004), the Fifth Circuit affirmed dismissal of the racial harassment claim based solely on a skit performed at the defendant's Christmas party in which Santa's helpers were portrayed by white children with their faces painted black and during which the other employees in the audience directed racially insensitive comments towards the plaintiff.  In *Pickens*, the court found that the comments did not reach the necessary level of severe and pervasive conduct.

The other case cited by defendant is also instructive.  In *Herberg v. California Institute of the Arts*, 101 Cal. App. 4th 142 (2002), the plaintiff was 82 years old and worked as a cashier in the accounting office at the defendant arts school.  *Id.* at 145. Without her knowledge, two art students prepared a drawing that then went on display at the school. The drawing featured Herberg, bare-breasted and facing the viewer, straddling a nude male faculty member as if the two were engaged in sexual intercourse.  *Id.* at 146. The drawing was seen by over 100 students, faculty members, and guests during the course of the day and a reception that evening.  It remained on display for 24 hours, until one of the

1   artists voluntarily removed it.  *Id.* at 147.

2       The court in *Herberg* analyzed in detail, hostile work environment claims based on a

3   single incident, concluding that to be actionable, a single incident "'must be severe in the

4   extreme and generally must include either physical violence or the threat thereof.'"  *Id.* at

5   151 (citation omitted).  The court concluded, "The nature of the alleged harassment in this

6   case *does not begin to approach* the severity of rape or violent sexual assault or even

7   milder forms of unwanted physical conduct. . . . Quite simply, *no reasonable jury* could

8   conclude that the presence of [the drawing] in the main gallery for 24 hours constituted

9   severe harassment within the meaning of the FEHA."  *Id.* at 153 (emphasis added).

10      The court finds that the single brief skit performed by Schaible, while clearly

11  inappropriate, offensive, and understandably upsetting to plaintiff, does not rise to the level

12  of severity or pervasiveness as to be actionable as sexual harassment.

13                  **c.      Failure to Prevent Harassment**

14

15      Finally, plaintiff has brought a claim against defendant for failure to prevent

16  discrimination and harassment.  Because the court has found no viable claim of

17  discrimination and that the single incident of harassment is not sufficiently severe and

18  pervasive to be actionable, there can be no independent cause of action for failure to

19  prevent discrimination or harassment under FEHA.  *Trujillo v. N. County Trans. Dist.,* 63

20  Cal. App. 4th 280, 289 (1998)("Employers should not be held liable to employees for failure

21  to take necessary steps to prevent such conduct, except where the actions took place and

22  were not prevented.").  In other words, the obligation to take reasonable steps to prevent

23  discrimination or harassment is not a completely independent cause of action under FEHA,

24  in that absent a showing of actionable discrimination, there can be no violation of

25  Government Code § 12940(I).  *See Northrop Grumman Corp. v. Workers' Comp. Appeals

26  Bd.*, 103 Cal. App. 4th 1021, 1035 (2002).

27      Additionally, on its merits the claims fails as well.  It is undisputed that defendant had

28

*United States District Court*
For the Northern District of California

1  no prior knowledge of the content of Schaible's skit.  Schaible had performed skits in the

2  past without incident; they contained no offensive conduct and were considered humorous,

3  even by plaintiff.  Schaible had no history of inappropriate comments or conduct and

4  therefore defendant had no reason to pre-screen the content of his January 27 skit.  *See*

5  *Doe v. Capital Cities*, 50 Cal. App. 4th 1038, 1054-55 (1996) (sustaining demurrer to failure

6  to prevent claim where the plaintiff failed to allege facts showing that defendant had "prior

7  knowledge of [the alleged harasser]'s propensity to engage in this particular form of sexual

8  harassment").

9         AT&T took reasonable steps to prevent discrimination and harassment in the

10  workplace.  It has had policies against discrimination and harassment in place during the

11  entirety of Nasser's employment in GRE.  Nasser Dep. 147:25-149:3, 153:7-154:1; Lewis

12  Dep. 38:20-39:17, 44:18-45:9.  These policies are set forth in the Code of Conduct, Nasser

13  Dep. 150:17-151:20, 152:21-153:6 & Exh. 3, Our Common Bond, *id.* at 154:2-155:6 & Exh.

14  4, and in other written forms, *id.* at 155:13-157:3 & Exhs. 5 and 6.  Nasser, and all AT&T

15  managers and employees, are reviewed annually on these policies.

### Conclusion

18         For all of the reasons stated above, the court GRANTS defendant's motion for

19  summary judgment an all claims asserted by plaintiff.  Doe defendants, who all remain

20  unnamed, are DISMISSED.  The trial date is VACATED.  The Clerk shall close the file.

21         **IT IS SO ORDERED**.

22  Dated: April 16, 2007

23  _____

24  PHYLLIS J. HAMILTON
    United States District Judge

*(left margin, vertical)* **United States District Court**  For the Northern District of California